THE PEOPLE *v.* FLORES.

APPEAL from the District Court of Mayagüez.

No. 251.—Decided February 14, 1911.

APPEAL—PROCEDURE—JUDICIAL PROCEEDINGS.—The regularity of judicial proceedings must be presumed, so long as there exists no evidence to the contrary, and, therefore, if the procedure followed in the lower court, as to certain particulars, does not appear in the transcript of the record, on appeal, it must be presumed that the procedure followed has been correct and in conformity with the law.

ID.—CASES WHERE IT APPEARS THAT THE INTERPRETER HAS ACTED AS ASSISTANT SECRETARY.—If from the transcript of the record it should appear that the interpreter of the court has acted in substitution of the secretary, and authenticated the proceedings as assistant secretary thereof, his capacity to act as such must be presumed, the legality of his intervention being thus justified, since the assistant secretary is the secretary's legal substitute.

CHARGE OF THE COURT TO THE JURY—MURDER IN THE FIRST DEGREE.—In this case the judge charged the jury as follows: ''The mere fact that poison was used induces the law to declare that there existed sufficient deliberation and premeditation, and that the crime is murder in the first degree.'' *Held:* That such charge was in accordance with the law and that the judge had power to instruct the jury as he did and inform them that *they were bound to admit as the law what was sustained as such by the court.*

ID.—CONSIDERATION OF THE EVIDENCE—CREDIBILITY OF WITNESSES.—''The jury is the judge of the evidence; the jury is the judge who is to determine as to which of the witnesses should be believed.'' The preceding charge is *correct,* for the jury is the sole judge of the facts and of the veracity of the witnesses, and only in exceptional cases, as when the jury commits manifest abuses of its powers in this respect, may the trial court or the appellate one set aside the verdict and allow a new trial.

ID.—REASONABLE DOUBT.—With respect to the following charge it was *held,* that although possibly defective in its form, it was not erroneous, but con-

tained an intelligible explanation of the true meaning of the words *reasonable doubt:* ''The words 'reasonable doubt' mean what they say—*a doubt that is reasonable;* they do not mean any doubt, but *a doubt such as would cause a prudent man to hesitate, if it referred to something important of his own life.''*

ID.—TESTIMONY OF POLICEMEN AND OF PUBLIC OFFICERS.—Another instruction given in this case is the following: ''The testimony of policemen and detectives, and, in general, of persons charged with the duty of investigating crimes, should be more carefully examined before giving credit thereto than the spontaneous testimony of a disinterested citizen; this must be taken into account by the jury in weighing the value of the evidence of each.'' *Held:* That it is *erroneous,* but as the error tends to favor, rather than prejudice, the defendant, it cannot be a ground for reversal. The testimony of policemen, detectives, etc., must be judged equally with that of any citizen, since the fact of their being in the discharge of such duties does not impair their testimony, which must be weighed like that of any other witness.

EVIDENCE—ADMISSIONS OF THE DEFENDANT.—Statements made by the defendant at any time, involving an admission of his guilt, are admissible as evidence, if it does not appear that they were obtained by means of threat or promise, but were made voluntarily and without any compulsion whatsoever.

ID.—CASES WHERE SUCH ADMISSIONS ARE PART OF THE RES GESTAE.—Statements made under such circumstances as to give them the appearance of involuntary, and which are inadmissible as confessions or admissions of the defendant, are, however, admissible when forming part of the *res gestae,* because they derive from the principal act, are contemporaneous with the commission thereof, and serve to illustrate and explain it.

ID.—CONFESSION OF THE DEFENDANT—CASES WHERE IT APPEARS IN WRITING.— When there exists a confession made by the defendant, written or signed by him, and by him accepted as a true confession, then the document itself must be produced as evidence, and only when it is shown that such document has been lost or mislaid, or through some other legitimate cause it cannot be produced, shall oral evidence on the confession be admitted.

ID.—In order to exclude the oral evidence referring to the confession of the defendant, it is necessary to show the existence of a written confession, made in due form; for the fact that an amanuensis of the *fiscal* took down in writing the statements of the defendant while he was testifying, does not imply that such writing was afterward submitted to the defendant and that he had signed and accepted it as his own true statement.

ID.—THE JURY IS NOT OBLIGED TO ACCEPT OR REJECT THE CONFESSION IN ITS ENTIRETY.—The rule that a confession must be considered in its entirety does not make it obligatory upon the jury to accept or reject it entirely, for the jury can and must believe the part that it may deem trustworthy while rejecting that which does not deserve its confidence, and, consequently, the instruction of the court to that effect is proper.

MURDER PERPETRATED BY MEANS OF POISON.—The unlawful killing of a human being with malice aforethought, and perpetrated by means of poison, constitutes murder in the first degree.

The facts are stated in the opinion.

*Mr. Luis Llorens Torres* for appellant.

*Mr. Jesús M. Rossy, fiscal,* for respondent.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an appeal from a death sentence. The information reads:

"In the name and by the authority of The People of Porto Rico. United States of America. The President of the United States, ss: *The People of Porto Rico* v. *Juan Flores Casiano and María del Carmen Meléndez y Jusliniano.* In the District Court of Mayagüez, on the 24th day of February, 1910. The prosecuting attorney files an information against Juan Flores Casiano and María del Carmen Meléndez y Justiniano, for the crime of murder in the first degree (felony), committed as follows: On or about the 12th of January of the present year 1910, and in *barrio* Rosario Peñón, within the municipality of San Germán, forming part of the judicial district of Mayagüez, the aforesaid Juan Flores Casiano and María del Carmen Meléndez y Justiniano, having agreed between themselves, wilfully and unlawfully, with malice aforethought, and firm and deliberate intention, did put to death Angel Martell by means of poison, administering for the purpose a deadly portion of a poisonous substance, mixed with arsenic called 'rough-on-rats,' the accused knowing that such poison in the quantity administered would produce death; said poison having been mixed with the potions given by them to said Angel Martell, who drank the same without knowing that said arsenic had been put into, and mixed with, the beverages he had taken, thus introducing into his stomach such quantity of said poison that it caused his death a few hours after. This act is contrary to the law for such case provided and against the peace and dignity of The People of Porto Rico. (Signed) Enrique Lloreda, District Attorney."

"The foregoing information is based on the testimony of witnesses examined under oath, and I do solemnly believe that there is just cause for the filing of this information. (Signed) Enrique Lloreda, District Attorney."

"Sworn to and signed before me this 24th day of February, 1910. (Signed) José Basora y Mestre, Secretary of the District Court of Mayagüez."

On February 25, 1910, the foregoing document was read to the accused and both pleaded "not guilty." Then the accused, Juan Flores Casiano, through his attorney, officially

appointed by the court, asked to be tried separately, and the court so decreed.

On March 1, 1910, the hearing was had, and the jury, after considering the allegations, the evidence, and the arguments, and receiving the instructions of the court, rendered the following verdict:

"We of the jury, and on their behalf the undersigned chairman, declare the accused, Juan Flores Casiano, guilty of the crime of murder in the first degree. Mayagüez, March 10, 1910. (Signed) Jacobo Bravo, Chairman of the Jury."

The court forthwith rendered its judgment and appointed March 16, 1910, for passing sentence, when the defendant appeared and was informed by the court of the nature of the charge against him, and of his plea, and the verdict rendered, and was asked whether he had any legal cause to show why judgment should not be pronounced against him, and no cause having been alleged, he was sentenced to death, a day being fixed for the execution and the manner thereof prescribed according to law.

An appeal having been taken from the aforesaid judgment, the execution thereof was stayed, and upon receipt of the transcript of the record by the Supreme Court, as the defendant had no counsel, Attorney Llorens Torres was officially appointed by the court to defend him.

Forming part of the transcript are the allegations, the instructions to the jury, the judgment and sentence, a statement of the case, and a bill of exceptions, duly approved and certified by the trial judge.

Both counsel for the defendant and the *fiscal* of this court filed their briefs, and at the hearing of the appeal orally argued in support of their respective contentions, namely, the granting of a new trial, demanded by the former, and the affirmation of the judgment, urged by the latter.

Let us examine the errors which, the appellant maintains, have been committed in this case.

He alleges, for the first time before this Supreme Court, that from the arraignment it does not appear that the judge had complied with the provisions of section 141 of the Code of Criminal Procedure, namely, that if the defendant appears for arraignment without counsel he must be asked by the court if he desires the aid of an attorney; nor does the record show that the jury, upon retiring for deliberation, were duly placed under the custody of a marshal sworn for the purpose, nor that the verdict was unanimous.

The record is silent upon these points, and there being no affirmative proof showing that the trial court had failed to comply with the provision of the aforesaid section 141, or that the jury had not been duly watched when retiring to deliberate, or that the verdict had not been the unanimous expression of the will of the jury, it is to be presumed that the proceedings were conducted in accordance with the law. Moreover, with respect to the verdict, the very terms in which it is couched show that it was obtained unanimously.

The appellant alleges that the judgment was rendered by the judge at chambers, the defendant not being present, and that the court acted at the trial without a secretary.

These allegations are not borne out by the record. On the contrary, from an examination thereof it is clearly to be deduced that the defendant appeared on the appointed day before the court by which he was informed and interrogated according to law and duly sentenced, after ascertaining that he could allege no legal cause why judgment should not be pronounced against him; and the record furthermore showed that the proceedings of the court had been conducted with the assistance of the deputy secretary thereof. The statement made on page 9 of the transcript to the effect that the interpreter, Francisco R. Flores, had acted in substitution of the secretary should be considered in its bearing upon what appears on page 4 of said transcript wherein said Francisco R. Flores signs as deputy secretary, and in its relation to the provision of section 2 of the Act Creating the

Office of Secretary of District Court, etc., approved March 1, 1904. (Laws of 1904, p. 118.)

The appellant alleges that the judge encroached upon the powers of the jury in giving them the following instruction: "The mere fact that poison was made use of evinces, according to the law, sufficient deliberation and premeditation to constitute the crime of murder in the first degree."

The instruction transcribed is in accordance with the law; it is based on section 201 of the Penal Code, and the judge had power to give it and to inform the jury that they were bound to receive as law what was laid down as such by the court, according to section 265 of the Code of Criminal Procedure. There is, then, no usurpation of powers, but the court made use of such as the law confers upon it.

Nor has the court erred in giving the following instruction: "The jury is the judge of the evidence; the jury is the judge who is to determine which witness should be believed." Such instruction, which must be considered in its bearing upon others given by the court in this case, is clearly sustained by the aforesaid section 265, and by the jurisprudence of the courts.

"As this court has held, and now repeats, the jury is the only judge of the facts and of the veracity of the witnesses. They see them and hear them testify, and are the only ones who can judge as to their credibility, and only in exceptional cases, of which there are few examples, when a jury commits a manifest abuse of power in this respect, will the trial court or the Supreme Court set aside the verdict and grant a new trial; *   *   *." (The People v. Villegas et al., decided by this court on May 5, 1904.)

Referring to a *reasonable doubt,* the judge in his instructions said: "The words *reasonable doubt* mean what they say—a doubt that is reasonable; they do not mean any doubt, but a doubt such as would cause a prudent man to hesitate, if it referred to something important of his own life." In our opinion, it cannot be maintained that such instruction is erroneous. It may perhaps be said that it is defective in

form, but it contains an intelligible explanation of the true meaning of the words *reasonable doubt.*

In the case of *Hopt* v. *Utah,* cited in that of *The People* v. *Nevárez,* decided by this court on February 1, 1906, after full consideration of the instructions of the court to the jury with respect to *reasonable doubt,* Justice Field said: "The instruction is not materially different from that given by Lord Tenterden, as repeated and adopted by Chief Baron Pollock, in *Rex* v. *Muller.* 'I have heard,' said the Chief Baron, addressing the jury, 'the late Lord Tenterden frequently lay down a rule which I will pronounce to you in his own language: "It is not necessary that you should have a certainty which does not belong to any human transaction whatever. It is only necessary that you should have that certainty with which you should transact your own most important concerns in life." No doubt the question before you to-day— involving, as it does, the life of the prisoner at the bar—must be deemed to be of the highest importance; but you are only required to have that degree of certainty with which you decide upon and conclude your own most important transactions in life. To require more would be really to prevent the repression of crime, which it is the object of criminal courts to effect.' 4 Fost. & Fin., 388–89, note. We are satisfied that the defendant was in no way prejudiced by the instructions of the court." (*Hopt* v. *Utah,* 120 U. S., 430.)

Referring to the testimony of the policemen who appeared as witnesses in this case, the trial judge gave the jury the following instruction, which was submitted to him by the defense: "The testimony of policemen and detectives, and, in general, of persons charged with the duty of investigating crimes, should be more carefully examined before giving credit thereto than the spontaneous testimony of a disinterested citizen"; the judge adding: "This must be taken into account by the jury in weighing the value of the evidence of each."

The foregoing instruction is erroneous, but the error committed, instead of prejudicing tends to favor the defendant, and it cannot, therefore, serve as ground for a reversal of the judgment.

The testimony of policemen, detectives, and persons charged with the duty of investigating crimes must be judged equally with that of any other citizen. The fact of their being in the discharge of such duties does not impair their testimony. If the jury consider that they are honest men who tell the truth it should believe them, and if it come to the conclusion, in view of the evidence introduced for the purpose, or the circumstances of the case, that they do not testify the truth, it should reject their testimony, acting in the same manner as when examining and weighing the testimony of any other witness.

Let us now examine the only exceptions which, according to the bill, were taken by the defendant; and we shall afterwards take up the questions raised in this Supreme Court with reference to the confessions of the defendant and the circumstantial evidence, and, finally, we shall consider whether or not the verdict is contrary to law or the evidence.

The first exception is stated in the bill as follows:

"The district attorney proceeded to take the oral evidence for the prosecution, and among other witnesses appeared Juan W. Martí, who, to questions propounded by the district attorney, replied: 'The following day I took the defendant to San Germán and conversed with him on the way. We talked of crimes and of how sad it was to commit a crime of that sort. He then said: "It would have been better to have stabbed him to death than to have killed him with poison." ' Counsel for the defendant objected to the witness' testifying upon this point, as he understood that the conversation had between the witness and the defendant was immaterial and did not form part of the res gestae. The judge overruled the objection, and counsel for the defendant entered an exception."

As to the first ground, we must say that the materiality of the testimony was evident, inasmuch as it implied an

admission of his guilt, made by the defendant himself. And as to the second, the declarations of the defendant, at such moments, may be considered as forming part of the *res gesta.* But even were it not so, such declarations of the defendant would still be admissible in evidence, since it does not appear that they were obtained by means of threats or promise, but made voluntarily by the defendant in the course of a conversation.

"The term *res gesta* or *res gestae* means literally a thing or things done. In the law of evidence the plural form *res gestae,* which has received more general use, is often employed to denote the contemporaneous facts, circumstances, acts, or declarations which grow out of the main fact and which serve to illustrate and explain it.

    ❊    ❊    ❊    ❊    ❊    ❊    ❊

"While confessions or admissions of facts from which guilt may be inferred, made at any time, are, as a general rule, admissible, declarations of the accused against his interest may be admissible as parts of the *res gesta,* even though they are inadmissible as confessions or admissions, because made under circumstances which render them involuntary." (24 Am. & Eng. Encyc. of Law, 661 and 678.)

The other exception taken is thus stated in the bill:

"The witness, Modesto Milán, a detective, also appeared, and among other particulars, to questions of the district attorney, replied: 'I took this man to the office of the district attorney because, waiving the right which the law grants him, he desired to make a declaration, and although informed by the district attorney that he was not obliged to testify if he did not wish, and that if he did, his testimony would be used against him, he testified. I remember that the clerk of the district attorney took down the defendant's testimony while he was giving it.'

"Counsel for the defense objected to the witness' testifying, because the testimony of the defendant had been given before the district attorney under oath and appeared in writing, which writing should be produced, oral evidence concerning the same not being admissible.

"The judge overruled the objection, whereupon counsel for defendant entered an exception, and the witness, with permission of the court, testified before the jury, as follows: ❊ ❊ ❊"

Of all the assignments of error in the present case this one seems to be the best founded. Where there exists a confession made by the defendant, written or signed by him, and by him accepted as his true confession, then the writing itself must be produced as evidence, and only when it is shown that the document has been lost or mislaid, or through some other legitimate cause it cannot be produced, parol proof of the confession may be admissible. (See Cyc., 479, and 6 Am. & Eng. Encyc. of Law, 577.)

But in the case at bar it has not been shown that such written confession exists. The fact that the district attorney's clerk wrote while the defendant testified does not imply that such writing was afterwards submitted to the defendant and that he had signed and accepted it as his own true testimony. The district attorney may have ordered his clerk to take down in writing the statements of the defendant made before him in the presence of witnesses under oath, so as the better to remember them at the proper time. The defendant should have shown that a written confession existed in due form, but as he failed to do so we cannot consider well founded the exception taken and, consequently, cannot reverse the judgment appealed from and order a new trial; especially when parol proof was produced not only of the defendant's testimony before the district attorney, but also of his admissions at the house of the victim and at police headquarters in San Germán; and likewise written evidence was produced of his testimony before the municipal judge of San Germán, taken down and presented in writing to the jury, wherein are contained statements substantially the same as those made in the testimony given before the district attorney and the admission of his guilt by the defendant in his conversation with the witness, Martí, to which we have alluded while considering the first of the exceptions taken by the defendant herein.

"It must be shown that a defendant signed a confession taken before a magistrate, or admitted it to be correct, in order to exclude

parol proof of the confession.—*State* v. *Eaton*, 3 Har., 554 [Del. 1840]. Parol proof of the confession of a prisoner is admissible, unless the defendant can prove the existence of a confession reduced to writing and signed by the prisoner.—*State* v. *Johnson*, 5 Har., 507 [Del. 1854]. In a criminal trial, a prosecuting witness may testify to a confession made by the defendant before the committing magistrate, unless it is proved that the prisoner assented to and signed his confession, when reduced to writing by the magistrate.—*State* v. *Vincent*, 1 Houst. Cr. Cas., 11 [Del. 1857]." (14 American Digest, Century Edition, par. 1208.)

The objections set up by the appellant in his brief with respect to the instructions of the judge concerning confessions of the defendant have no ground to stand upon, in our opinion. These instructions were not objected to in the lower court, while some of them were given at the request of the defendant's counsel and others submitted by the defense to the judge who transmitted them to the jury.

Aside from the exceptions we have already considered no other appears to have been taken by the defendant herein. . The testimony of the witnesses who heard the declarations of the defendant at the victim's house and at the San Germán police headquarters, and the written testimony of the defendant himself given before the municipal judge of San Germán, was admitted without protest on the part of the defendant, while the exceptions taken with regard to the admission made by the defendant in his conversation with Detective Martí, and to the testimony of the defendant before the district attorney, have been already considered and declared by us in this opinion as lacking foundation. With respect to all these statements, admissions, and declarations of the defendant there exists evidence in the record tending to show that they were voluntary and not obtained through promises, compulsion, or threats, and this being so they constituted admissible evidence properly submitted to the consideration of the jury.

This interesting and delicate question of the confession of the defendant has been fully considered by this Supreme

Court on several occasions. We cite the case of *The People*
v. *Rivera,* for murder in the first degree, decided June 25,
1904, and that of *The People* v. *Kent,* decided March 5, 1906,
and invoke the legal doctrine laid down in them as one of
the grounds of this opinion.

In the case of *The People* v. *Martínez et al.,* decided December 4, 1909, this Supreme Court said:

"The general rule in regard to confessions and their admissibility
is clearly stated by Judge Freeman in a luminous note to a Georgia
case found in 6 American State Reports, on page 242. It is couched
in the following words: 'A confession freely and voluntarily made is
not only admissible in evidence, but is evidence of the most complete
and satisfactory nature. It is difficult to conceive how any person can
voluntarily and freely confess himself guilty of the commission of a
crime unless urged to do so by the promptings of truth and conscience.
As, however, the history of criminal jurisprudence contains numerous
well-authenticated cases in which persons accused of crime have confessed themselves guilty of imaginary and impossible crimes, and of
crimes that were afterwards proved never to have been committed
at all, it has become a well-established doctrine of English and American law that confessions of guilt should be received with caution,
especially where the evidence offered is of verbal confessions. And
the courts are very careful, before admitting confessions in evidence,
to satisfy themselves that they were not made under the influence of
hope or fear, or of any inducement that would be likely to lead the
persons who made them to make an untrue confession. The admissibility or inadmissibility of a confession is to be determined by ascertaining whether or not it was induced by such means as would be likely
to make the accused confess that he had committed a crime which, in
fact, he did not commit." (*Commonwealth* v. *Knapp,* 9 Pick., 496;
20 Am. Dec., 491; Joy on Confessions, 51. *Daniels* v. *State,* 6 Am.
St. Rep., 242.)

The appellant alleges that the court departed from good
doctrine in giving to the jury the following instruction:

"The court instructs the jury that the testimony given by the
defendant during his detention should not be accepted as true in its
entirety, if they believe only part of it." The judge added: "This
is in accordance with the general rule that the jury should examine

the testimony of all the witnesses and may believe that part which should appear to them worthy of credence and reject the other parts, the same being the case as to confessions made by the accused during his detention."

We do not agree with the appellant. The opinion of the court is correct, because "the rule that a confession is to be considered in its entirety does not compel the jury to give the same belief to every part of it. The jury may attach such credit to any part of it as they deem it worthy of, and may reject any portion of it which they do not believe. All of it must be carefully weighed by the jury, and upon all the circumstances surrounding the case they must determine how much of it they will receive and how much they will reject." (12 Cyc., 484.)

As to the instructions of the court regarding the circumstantial evidence, it appears from the record that those given were the same that had been submitted to the court by counsel for the defendant. We have examined these instructions, moreover, and do not find that in transmitting them the court has committed any fundamental error.

We have also examined very carefully the law applicable to this case, and the evidence taken, and have arrived at the conclusion that the verdict is not contrary to law nor to the evidence, as alleged by the appellant.

The unlawful killing of a human being, with malice aforethought, by means of poison, constitutes murder of the first degree, as defined in sections 199, 200, and 201 of the Penal Code, and is punishable by death or, if there be extenuating circumstances, by confinement in the penitentiary for life. under section 202 of the same code. Should the defendant confess himself guilty, the court shall determine the penalty.

And the evidence taken shows beyond a reasonable doubt the certainty of the killing of Angel Martell by poison, and the voluntary and deliberate intervention of Juan Flores Casiano in said act as principal.

Angel Martell, a farmer of about 30 years, was living in *barrio* Rosario Peñón, municipality of San Germán, within the judicial district of Mayagüez, in concubinage, since many years, with María del Carmen Meléndez.

Juan Flores Casiano, a man of about 33 years of age, made his appearance in said *barrio* at the coffee-picking season. He lived for a few days at the house of María Ramona Justiniano, mother of María del Carmen Meléndez, and then removed to Martell's own house, where he continued to live in company with María del Carmen after the death of Martell and until he was imprisoned in these proceedings.

Martell, who did not appear to be suffering from any illness, died one night, some time in January, 1910, complaining of a pain in his stomach. A relative and neighbor of his—the witness, Adolfo Barbosa—went to his house and found him "vomiting," "complaining of a pain," "rolling down and rising," and saw beside him "Juan Flores Casiano and the woman." Another witness, Juan Ramón Ramos, a neighbor of Martell's hearing cries, went to the latter's house and found Juan Flores, who invited him to come up and asked him to hold a candle while he was giving Martell a drink in which he put some powders taken from a box he had in his pocket, wrapped up in a handkerchief. And the witness further stated that he remained in the house, and that Martell died about an hour after taking the potion.

The body of Martell was buried without difficulty, as having died a natural death from *angina pectoris,* according to the certificate of the *practicante,* Cuerda, upon information given him by Juan Flores Casiano; but a suspicion that something strange had happened developed and was bruited about the *barrio* until it reached the ears of the police and of the municipal judge of San Germán, and by order of the latter and with his intervention the body was exhumed a few days after it had been buried. A physician dissected it, removed the stomach, which was sent to the chemical laboratory and there examined by an expert, who testified under

oath before the jury that "after making a chemical analysis of the viscera I reached the conclusion that it contained a large quantity of arsenic, capable of causing the death of several persons."

The police also, from the first moment, took steps to ascertain the truth of what had happened. Detective Juan M. Graciani repaired to Martell's house and found there Flores and María. He questioned them about the death of Martell. At first Flores answered, saying that Martell had died from a sudden pain while in good health, but afterwards declared:

"That it was true Martell had died by poison that María del Carmen Meléndez, his wife, had put in his coffee. That with 50 cents she had given him he had bought said powders in a Mayagüez drug store which he supposed was Saliva's, although he was not sure."

The declarations of Flores Casiano were also heard by the witness, Galo Graciani, who testified at the trial under oath as follows:

"I knew a person by the name of Angel Martell, who died poisoned on January 12. I went, in company with Juan María Graciani, to make the investigations at the house, and there Juan Flores Casiano testified in my presence before the police that he had been to a drug shop here in Mayagüez some days before and had bought arsenic; that he did not know what it was, nor could he tell exactly in what drug shop he had bought it; that he was urged on by the idea of poisoning Angel Martell, to whom they administered the arsenic in some coffee and milk."

Juan Flores Casiano was then taken to San Germán, and on the way he had a conversation with the detective, Martí, who testified thereon under oath, as follows:

"Next day I took the prisoner to San Germán and had a talk with him on the way. We spoke of crimes and how sad it was to commit a crime. Then he said: 'It would have been better to have stabbed him to death than to have killed him with poison.' When he said this we had not been talking of anybody in particular; we were talking

about crimes, about what assails the conscience of one who commits a crime. Then it was that he made the remark.''

When Flores Casiano arrived at police headquarters in San Germán there occurred what follows, as testified under oath before the jury by Chief Salomón Costa:

''On that day there arrived at headquarters, at 3 or 3.30 p. m., the prisoner and the woman accompanying him, brought in by the police, who on arriving reported what had occurred. I then put several questions to the prisoner, and he told me that he had done it. The questions put by me did not imply any compulsion; but he freely and spontaneously stated that the woman, María del Carmen, and himself lived in the house belonging to her and the deceased; that said woman had invited him, or, more properly speaking, he had told her that he wanted to procure something to daze Angel Martell; that then he came to Mayagüez, bought a box of poison in a drug store near the church, but could not tell which; that he returned to *barrio* Peñón; there they prepared some coffee and milk and took it to the place where he was working and gave it to him; shortly after that the man came home suffering from pain in the stomach; then he (Flores) went to the hamlet Rosario to get some medicine from the *practicante.* He told me that he had brought the medicine and that they had begun to administer it by spoonfuls, and that shortly after the man had died. He said to me that he had given him a medicine that he had obtained from the *practicante,* and that while administering it by spoonfuls he died.''

To questions put by counsel for defendant, he answered:

''I said that the prisoner told me that he came to Mayagüez to buy, not a poison, but something to daze the man with. I said that the prisoner told me that he and that woman had gone to the place where Martell was working; the prisoner told me that it was the woman who carried the bottle, but that he assisted her in carrying it, and that it already contained the poison. These declarations were made quietly by the prisoner himself. Then the woman came. I called her, and she made a statement to the same effect. There was no compulsion nor promise, and the prisoner himself can say if there was any. The prisoner was under arrest; he offered no resistance; whether or not he had offered any resistance I cannot tell, but the police did not say that he had. The prisoners arrived there, and after listening to

the report, I said: 'Take them to the municipal court,' and there he immediately testified.''

Juan Flores Casiano was brought before the municipal judge conducting the preliminary proceedings, and there he gave his testimony in due form, the same being reduced to writing and presented to the jury. The judge, testifying as a witness before the jury, said:

''I am the municipal judge of San Germán; I know the prisoner; I have seen him before in the Municipal Court of San Germán, when he was taken there by the police, he testifying before the court. In court I informed the prisoner as to his right to testify or not, and he voluntarily declared that he desired to testify, which he did. · This testimony he gave freely and spontaneously, after being duly admonished by me. This is the testimony given by Juan Flores Casiano. The witness, by order of the court, at the instance of counsel for the prisoner, read the testimony, which follows:

'' 'I, Juan Flores Casiano, a resident of San Germán, living in Rosario Peñón, unmarried, a laborer, 33 years of age, do hereby testify: That I have been informed by the municipal judge of San Germán as to the charge against me in the prosecution for the unlawful killing of Angel Martell, and of my right to abstain from testifying; but being desirous to do it, I declare that the facts are as follows: On October of last year I entered into amorous relations with María del Carmen Meléndez, the concubine of Angel Martell. She at that time proposed that I should get her away from the house and take her to live with me, which I refused to do. About a month ago, at the suggestion of herself and of Angel Martell, I went to live with them at their house. As soon as I was installed there she proposed first that I should find some charm wherewith to daze or bewitch Angel Martell, and, next, that I should procure some rough-on-rats to kill him with, but I accepted neither proposition. On Monday of last week I went to Mayagüez to buy some stuff for a pair of trousers, and María gave me 50 cents with which to buy a box of rough-on-rats, telling me that it was intended for rats and for the extirpation of *comején* (woodboring white ants) which infested the house. On the same day I returned, bringing the box with the desired powders, which I bought in a drug store, the name of which I do not remember, but which is near the church. I handed the box to María del Carmen, and on Wednesday, the 12th inst., at early dawn, I went to work on Doña Duba's estate (I do not know her family name), and Angel remained

in the house; but shortly after—that is, half an hour later—I saw him pass on his way to his work on another estate. In all that morning I did not see María del Carmen until about 10 o'clock, when she hailed me from a distance, and I then noticed that she was with Angel. When I came close to them the latter was suffering from pain in the stomach and vomiting. I helped to carry him to his house, and later I went to the *practicante,* Rafael Cuerda, to whom I explained what ailed Angel. He gave me a potion which I personally administered by spoonfuls, and at 1 or 2 o'clock the following morning he died. On Thursday, the 13th, I went to 'El Rosario,' reported the death to Cuerda and Galo Graciani, in charge of the civil registry, and brought the coffin to bury him in. It was not true that I had proposed to María del Carmen the killing of Angel Martell, nor that I had bought the rough-on-rats and put it into the coffee she had to carry to her paramour; neither was it true that I had threatened María with killing her if she failed to apply the poison, and that I remained watching when she took breakfast to Angel to see that she gave him the poisoned coffee; nor is it true that I did not take to the house the potion Cuerda had given me and had substituted for it a quarter bottle of rum and anise, bought of José Rodríguez, to be given to Martell as a mixture of *tártago* (spurge) after putting poison in it. I do not know where is the box containing the poisonous powders. Juan Florés, his mark.' Sworn to and signed before me in San Germán this 20th day of January, 1910. John J. Siebert, Municipal Judge."

Counsel for the defendant did not cross-question the witness.

And, finally, Juan Flores Casiano, having been brought before the district attorney and duly warned by this official that if he testified his testimony might be used against him, the prisoner substantially repeated the statements he had made while testifying before the municipal judge, according to the sworn statement of the detective, Milán.

In order to corroborate the testimony of Flores Casiano, the detective, Milán, took him to Saliva's drug store, where he was recognized by the clerk, Manuel Marín, who testified under oath before the jury, as follows:

"I know the prisoner, who was there, I think, one morning in January and called for a box of rough-on-rats. The day before he had bought some *cebadilla* (caustic barley). The clerk who had sold

it to him was not there. He had 14 cents and the small quantity of *cebadilla,* worth only 5 cents, which made 19 cents, for which he wanted a box of rough-on-rats, and said he would owe me 1 cent. I sold it to him. He said, as he entered the shop, that he did not need the *cebadilla* he had bought; that what he wanted was a box of rough-on-rats, because it was a poison. I asked him what he wanted it for, and he told me that it was to kill rats. Then I warned him to be careful and take the necessary precautions in using it, because it was a very active poison. I informed him that these powders could cause the death of a person, for when he told me that he wanted a very strong poison I supposed he might think that this one was not strong enough. Then I warned him to be cautious on account of children and others. Rough-on-rats is an arsenical salt. One of these boxes can hold two ounces, equal to about 58 grams. Rough-on-rats is a more active poison than *cebadilla;* with one gram of it there is enough to kill anybody. As much as 10 centigrams may be taken in one day, and with 20 centigrams any person may be killed.''

To cross-questionings of the defendant's counsel, he replied:

''I cannot tell exactly the day Juan Flores was there. I know it was in January; that a few days later Policeman Milán came with the gentleman. It was at the beginning of January. I cannot tell the precise day, but it was during the first days of January.

The *practicante,* Cuerda, testified under oath before the jury that he had issued the certificate of the death of Martell, from *angina pectoris,* in view of the statements made to him by Juan Flores Casiano; that he afterwards searched the premises around Martell's house and had found buried some clothing belonging to Martell and a dead chicken that apparently had been poisoned. He testified further:

''I did not know that Angel Martell was ill. I know Juan Flores Casiano; I have seen him two or three times in town. He is the defendant. The day before the morning in question I did not see Juan Flores. He was not at my house. I was not aware that Angel Martell was sick, the *barrio* where he lived being quite distant from town. I do not remember having prepared any medicine for Martell. I saw this man in town three or four times, and one day he was at my house with a brother of his. This was a long time before. But

neither on the day Martell died nor the one before did I see the defendant at my house.''

And the witness, José Rodríguez, also testified under oath before the jury that the day before Martell's death he had sold some rum and anise to Juan Flores Casiano.

Such was, briefly, the evidence examined in this case. The killing of Martell was clearly shown by direct evidence, and the guilt of the defendant, Juan Flores, as principal in the taking off of Martell in the manner charged in the information, was also fully established by all the evidence taken and considered together.

The crime committed by Juan Flores Casiano is one of the most heinous that can be imagined, and the terrible penalty imposed upon him is the just punishment the law prescribes for crimes of such nature.

The appeal should be dismissed and the judgment appealed from, affirmed.

*Affirmed.*

Chief Justice Hernández and Justices MacLeary and Wolf concurred.

Justice Aldrey took no part in the decision of this case.